UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JAMES NICHOLSON,
Defendant.

No. 09-cr-414 (RJS)

ORDER

RICHARD J. SULLIVAN, Circuit Judge:

Defendant James Nicholson ("Nicholson") moves to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A); the government opposes. (Doc. No. 112 ("Def. Mot."); and Doc. No. 124 ("Gov't Opp'n").) For the reasons set forth below, Nicholson's motion is DENIED.

## I. BACKGROUND

### A. Factual Background

In August 1999, Nicholson founded and operated Westgate Capital Management LLC ("Westgate Capital"), where he served as an investment advisor in the New York area. (Pre-Sentence Investigation Report ("PSR"), dated Oct. 8, 2010, ¶¶ 9–11.) In this role, Nicholson fraudulently induced prospective clients to trust him with their money, failed to invest their funds as promised, and instead misappropriated those funds for his benefit. (Indictment ("Indict.") ¶ 3; PSR ¶ 2.)

Nicholson had a long history of defrauding investors. Just months before starting Westgate Capital, he had resigned from his previous employment at a brokerage firm after an internal audit revealed that he had wired money from a customer account into his personal bank account. (PSR ¶ 139 & n.5.) And in 2001, the National Association of Securities Dealers ("NASD") barred Nicholson from working in the securities industry in any capacity following an investigation of his

conduct at a different brokerage firm; that investigation revealed that he had stolen over $300,000 from a client account and obstructed the NASD's investigation by forging a letter from the client-victim that purported to exonerate him of wrongdoing. (*See id.* ¶¶ 94–97.) Ultimately, the NASD barred Nicholson from holding himself out as an investment adviser or accepting client funds for any purpose. (*See id.* ¶¶ 13, 97.)

Yet from at least 2004 through February 2009, Nicholson again posed as an investment adviser, this time using Westgate Capital as the vehicle to defraud hundreds of victims of over $100 million. (*See id.* ¶¶ 9–11.) To execute the scheme, Nicholson relied on personal connections to induce prospective clients to invest their money with Westgate Capital. He then failed to invest those funds, while also misappropriating tens of millions of dollars for his own personal use. (*See id.* ¶¶ 11–12, 14.) To allay the concerns of his clients – most of whom were not sophisticated investors, but rather middle- and working-class individuals (including friends and family members) who entrusted him with their life savings – Nicholson concealed the theft by fabricating false reports and account statements, creating fictitious auditing firms, and making repeated false statements.

While Nicholson now characterizes his fraud as a failure to disclose losses in 2008 after the collapse of Lehman Brothers Holdings Inc., he in fact defrauded individuals for years before and after that point. (*See* Doc. No. 114-4 at 1.) For example, just days before he was arrested, "at a time when the world was collapsing, when there was no possibility of paying back [the funds he had lost or stolen]," Nicholson misappropriated client funds to buy "a home worth over $25 million in the Hamptons." (*See* Doc. No. 79 ("Sent. Tr.") at 71:18–21.)

**B. Procedural Background**

In 2009, a grand jury returned an indictment charging Nicholson with (i) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; (ii) investment adviser fraud, in violation of 15 U.S.C.

§§ 80b–6 and 80b–17; (iii) mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342; and (iv) unlawful structuring of monetary transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324. (Indict. ¶¶ 10–18.) Two months later, Nicholson pleaded guilty, pursuant to a plea agreement with the government, to all but the structuring count. (Doc. No. 28 at 29:4–29:21.) Following a full evidentiary hearing in May 2010 concerning the loss amount attributable to Nicholson, the Court concluded that the losses to Nicholson's victims exceeded $100 million. (Doc. No. 59.) The Court also received letters from over a hundred of Nicholson's victims detailing the financial and psychological harm that they had suffered as a result of Nicholson's criminal conduct.

Before imposing Nicholson's sentence, the Court adopted the PSR's findings and determined that Nicholson's total offense level under the advisory Sentencing Guidelines was forty-two; his criminal history category was Category I; and the resulting Guidelines range was 360 to 540 months' imprisonment. (*See* Sent. Tr. at 7:21–8:25.) The Court then sentenced Nicholson to a term of 480 months' imprisonment and three years' supervised release. (*Id*. at 77:19–79:13.) In explaining its chosen sentence, the Court noted that Nicholson had callously exploited his victims, who were not institutions or professional investors but rather "individuals who basically gave [him] everything they had" and "entrusted their whole lives to him." (*Id*.) The Court concluded that a forty-year sentence was warranted because a lesser sentence would "send the wrong message" to the public and would be "inappropriate" and "unfair to the victims." (Sent. Tr. at 71:4–9; 76:13–25.) The Court observed that it had encountered "very few crimes of this magnitude" or which had "inflicted this much pain" on innocent victims and their families. Nonetheless, the Court stated that a forty-year sentence would leave Nicholson "at least the hope of living the last years of his life as a free man." (*Id.* at 76:1–4, 17–18.).

In 2011, Nicholson filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, alleging that he had received ineffective assistance of counsel in connection with his decision to plead guilty. (Doc. No. 99.) The Court denied Nicholson's motion. *See Nicholson v. United States*, No. 09-cr-414 (RJS), 2014 WL 4693615, at *1 (S.D.N.Y. Sep. 22, 2014). In doing so, the Court observed that "it would have imposed the same sentence of forty years' imprisonment even if counsel had made, and preserved, every argument raised in [Nicholson's section 2255 motion]." *Id.* at *10. The Court explained that Nicholson's "forty-year sentence was not the result of a mechanical application of the Guidelines" but instead a "careful assessment and balancing of the various factors identified by Congress and the Supreme Court as relevant to the calculation of a criminal sentence." *Id.* Nicholson appealed.

In a consolidated appeal, the Second Circuit affirmed both this Court's sentence and its denial of Nicholson's habeas petition. *See United States v. Nicholson*, 638 F. App'x 40 (2d Cir. 2016). In concluding that the forty-year sentence was substantively reasonable, the Second Circuit rejected Nicholson's contention that the district court "afford[ed] too much weight to the Guidelines' loss calculations and too little weight to the need to avoid sentencing disparities." *Id.* at 42. Instead, the Court of Appeals concluded that "case-specific information" – including the district court's "review of hundreds of victims' letters" and "the in-court statements of nine victims" – "put Nicholson's crime in context, revealing the identified loss to have been sustained by hundreds of individuals of modest means, many of whom lost their life savings." *Id.*

**C. Compassionate Release Motion**

In June 2020, Nicholson applied for compassionate release with the warden of FCI Otisville, contending that he should be released "to provide for [his] children and care for [his] mother." (Gov't Opp'n, Ex. A). Three days later, the warden denied his application. (Gov't Opp'n, Ex. C.) Nicholson then filed a new application for compassionate release in 2022. (*Id*. at

7.) This time, he argued for release due to "his capacity and desire to work for the benefit of affected investors, his mother's failing health, his confinement during the full sweep of the pandemic, and his indisputable rehabilitation." (Doc. No. 114-1.) The warden denied that application as well. (Gov't Opp'n, Ex. C.).

In 2023, Nicholson filed this motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A); over the intervening months, he has supplemented the motion several times. (*See, e.g.*, Doc. Nos. 131–34, 137.) For purposes of this motion, the Court assumes that Nicholson has properly exhausted his administrative remedies, as required by section 3582(c)(1)(A). *See* Gov't Opp'n at 12–13 (not contesting that Nicholson has exhausted administrative remedies); *United States v. Saladino*, 7 F.4th 120, 121 (2d Cir. 2021) (explaining that section 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional).

Nicholson requests that the Court reduce his forty-year sentence – of which he has served approximately seventeen years – to a sentence of time served. (Def. Mot. at 3.) He argues that: (i) he is committed to paying restitution, and consequently, the interests of his victims favor his release (*id*. at 5, 18, 31); (ii) he is needed to take care of his ailing mother (*id*. at 21); (iii) he was subjected to harsh conditions of confinement during the COVID-19 pandemic (*id*. at 24); (iv) his sentence is disproportionately long when compared to those of other similarly situated defendants (*id*. at 25); and (v) he is fully rehabilitated (*id*. at 9). Nicholson also asserts that his requested relief is consistent with the purposes of sentencing. (*Id.* at 2.) At the Court's direction, the government notified Nicholson's victims of his request for early release and provided them the opportunity to submit statements. Thirty-six victims responded, all but one of whom opposed Nicholson's request. (Doc. No. 127-1.)

## II. DISCUSSION

A district court may reduce a sentence pursuant to section 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction" and that the reduction "is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *see United States v. Halvon*, 26 F.4th 566, 568 (2d Cir. 2022). The defendant bears the burden of demonstrating that the circumstances warrant a sentence reduction. *See United States v. Fernandez*, 104 F.4th 420, 427 (2d Cir. 2024). For the reasons set forth below, Nicholson has failed to carry that burden.

### A. No Extraordinary and Compelling Circumstances Justify a Reduction of Nicholson's Sentence.

In evaluating a motion for compassionate release, district courts may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). An "extraordinary" reason is one that is "most unusual, far from common, and has little or no precedent," or is "beyond or out of the common order, remarkable, or synonymous with singular." *Fernandez*, 104 F.4th at 428 (alternations and internal quotation marks omitted). A "compelling reason is both powerful and convincing." *Id.* (internal quotation marks omitted). Here, Nicholson has not articulated any extraordinary and compelling reason warranting a sentence reduction.

1. Commitment to Restitution

Nicholson first contends that his commitment to paying restitution to his victims and the "desire of victims to receive more restitution" weigh in favor of his release. (Def. Mot. at 5–6.) But Nicholson cites no authority in support of this argument, and the Court has found none. That dearth of support is hardly surprising: Far from being an extraordinary or compelling reason, the obligation to recoup losses is faced by all defendants, who, like Nicholson, *stole* funds from their

victims and so directly caused such losses. And if that obligation itself could constitute an extraordinary or compelling reason for a sentencing reduction, then every defendant ordered to pay restitution as part of his sentence could convert that obligation into a ground for compassionate release. Furthermore, Nicholson's argument rests on the *hypothesized* "desires of [his] victims" – not their actual, expressed preferences. (*Id.* at 5–6.) As noted above, all but one of the three-dozen victims who submitted letters in response to the government's notification opposed Nicholson's early release. (Doc. No. 127-1.) And Nicholson offers no concrete explanation as to how he would begin to pay the more than $120 million that he currently owes even if he *were* released from prison, especially given his limited career options as a serial fraudster. (*See* Def. Mot. at 23 n.4 (describing Nicholson's career plans as "work[ing] remotely from home as a researcher").) For all these reasons, Nicholson's outstanding restitution obligation is not an extraordinary or compelling reason justifying his release.

2. Family Circumstances

Nicholson also cites the need to care for his elderly mother, who suffers from early-onset dementia, as an independent basis to support his motion for compassionate release. (*Id.* at 22.) But before courts can conclude that such circumstances constitute an extraordinary and compelling reason, they "generally require a showing of evidence from several sources indicating that the defendant is the *only* available caregiver for a family member in dire conditions." *United States v. Lindsey*, No. 13-cr-271 (LTS), 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021) (emphasis added) (internal quotation marks omitted). Nicholson has failed to make that showing here. As the record makes clear, Nicholson has two siblings who can help with caretaking – including one who lives in Rockland County near their mother. (Doc. No. 114-24 at 1.)

Further, while the Court is mindful of the difficult situation faced by families with an aging parent, the possibility of such a predicament was not unforeseen at the time the Court imposed a

forty-year sentence. Unfortunately, such situations are often the "inevitable" outcome faced by close relatives "when a family member is incarcerated." *United States v. John*, No. 15-cr-208 (CM), 2020 WL 6581217, at *2 (S.D.N.Y. Nov. 10, 2020); *see, e.g.*, *United States v. McBriarty*, No. 16-cr-109 (SRU), 2021 WL 1648479, at *8 (D. Conn. Apr. 27, 2021) (denying sentence reduction where the defendant's siblings were available to care for their mother and observing that "[a]lthough it seems that [the defendant] may be the best available caregiver for his ailing mother, he is not her only available caregiver"). Accordingly, the declining health of Nicholson's mother, while regrettable and undoubtedly difficult for the family, is not an extraordinary or compelling basis for reducing his sentence.

3. Pandemic-Related Conditions of Confinement

Nicholson next argues that his sentence should be reduced in light of the conditions of confinement that existed during the COVID-19 pandemic. (*See* Def. Mot. at 24–25.) But as numerous courts have recognized, "the pandemic itself – without more – does not present extraordinary and compelling circumstances warranting a compassionate release." *Musa v. United States*, 502 F. Supp. 3d 803, 814 (S.D.N.Y. 2020) (internal quotation marks omitted); *accord United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (explaining that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"); *see also United States v. Jones*, 17 F.5th 371, 375 (2d Cir. 2021) (upholding district court's denial of compassionate release where defendant claimed possibility of contracting coronavirus constituted extraordinary and compelling reason). And Nicholson's complaints about harsh prison conditions, even if true, are not "unusual or unique to him." *United States v. Panos*, No. 18-cr-581 (KMK), 2026 WL 221245, at *22 (S.D.N.Y. Jan. 27, 2026). Because such generalized statements about prison conditions "untethered to compelling specifics" do not make a defendant's conditions "extraordinary and compelling," Nicholson's

argument for a sentence reduction on this basis is without merit. *United States v. Santana*, No. 12-cr-790 (PAE), 2023 WL 2625790, at *4 (S.D.N.Y. Mar. 24, 2023).

4. Sentencing Disparities

Nicholson also asserts that his forty-year sentence is disproportionately harsh compared to those of purportedly similar white-collar criminals. (Def. Mot. at 25–30.) But again, Nicholson has failed to carry his burden to show that the length of his sentence is an extraordinary and compelling reason for his release.

To begin, district courts across the country have continued to impose lengthy and, in some cases, decades-long sentences on defendants who – like Nicholson – were convicted of massive frauds. For example, a district court in North Carolina imposed a forty-year sentence on defendant Keith Simmons for his participation in a $35 million scheme – a loss amount that comprised less than a third of what Nicholson inflicted on his victims. *United States v. Simmons*, No. 10-cr-23 (RJC) (W.D.N.C. Dec. 9, 2014). Likewise, district courts in Missouri and Florida imposed forty-year sentences on defendants Martin Sigillito and Fred Davis Clark, Jr., respectively, for their participation in $50 million and $190 million schemes. *United States v. Sigillito*, No. 11-cr-168 (LRR) (E.D. Mo. Dec. 28, 2012); *United States v. Clark*, No. 13-cr-10034 (JEM) (S.D. Fla. June 27, 2016); *see also United States v. Stinson*, No. 10-cr-724 (MMB) (E.D.P.A. Apr. 11, 2012) (33 years for $14 million scheme). And in some cases, defendants guilty of crimes similar to Nicholson's have received even *higher* sentences. *See, e.g.*, *United States v. Durham*, No. 11-cr-42 (JMS) (S.D. Ind. Dec. 10, 2012) (50 years for $200 million loss amount); *United States v. Wasendorf*, No. 12-cr-2021 (CJW) (N.D. Iowa Jan. 31, 2013) (50 years for $215.5 million loss amount); *United States v. Petters*, No. 8-cr-364 (RHK) (D. Minn. Apr. 8, 2010) (50 years for $4 billion scheme). These examples alone demonstrate that the length of Nicholson's sentence does not constitute an extraordinary or compelling reason for his release.

Nicholson nonetheless cites various cases, mostly from before October 2010, in which defendants convicted of frauds that resulted in greater losses than Nicholson's received lower sentences. (*See* Def. Mot. at 26–29.)[1] But Nicholson does little to explain why these unrelated cases – involving different defendants, crimes, and sentencing considerations – establish an "unwarranted" sentencing disparity that constitutes a compelling basis for his early release. *United States v. Fernandez*, 443 F.3d 19, 31–32 (2d Cir. 2006). By contrast, the Court carefully articulated at sentencing why it distinguished Nicholson's conduct from that of other white-collar defendants:

> The victims of these crimes were not banks, they were not large corporations, they were not governments, they weren't institutional investors; these were individuals who basically gave Mr. Nicholson everything they had, they entrusted their whole lives to him. They couldn't diversify; they were not sophisticated investors. And it seems very clear that Mr. Nicholson played on those relationships and cultivated them, encouraged them, to invest their last pennies with him even when it was clear that there was no opportunity for any of that money to be recovered [–] it was just being taken away.

Sent. Tr. 71:11–20; *see Nicholson*, 2014 WL 4693615, at *11 (explaining that Nicholson's victims were, by and large "middle class and working class people who trusted [him] to invest their life savings – accumulated as a result of decades of work and frugality or from the sale of homes purchased years before"). In other words, the pre-2010 defendants identified by Nicholson were convicted of large-scale accounting frauds that resulted in massive stock drops spread out over millions of investors; Nicholson, by contrast, stole the life savings of individual investors – all while looking them in the eye and insisting that their investments were safe. As the Court noted at Nicholson's sentencing in 2010, that significant distinction, based on the unique hardship that

[1] Specifically, Nicholson points to the cases of Bernard Ebbers, who was initially sentenced in 2005 to 300 months' imprisonment for his involvement in the Worldcom, Inc. accounting fraud that caused more than $2 billion in actual losses (*see* No. 02-cr-1144 (VEC), Doc. No. 305 (S.D.N.Y. July 18, 2005)); John and Timothy Rigas, who ultimately received sentences in 2008 of 144 and 204 months' imprisonment, respectively, for their involvement in the Adelphia Communications financial fraud (*see* No. 02-cr-1236 (KMW), Doc. Nos. 253, 254 (S.D.N.Y. June 27, 2005)); Jeffrey Skilling, who was initially sentenced in 2006 to 292 months' imprisonment for his role in the Enron accounting fraud that caused over $2 billion in actual losses (*see* No. 04-cr-25 (SL), Doc. No. 1149 (S.D. Tex. Oct. 23, 2006)); and Marc Dreier, who was sentenced in July 2009 to twenty years for running a $400 million Ponzi scheme), *see* No. 09-cr-85 (JSR), Doc. No. 84 (S.D.N.Y. July 17, 2009).

Nicholson's crimes inflicted, readily justified a higher sentence. *See United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (holding that disparities, if any, between a defendant's sentence "and the purported national average and median sentences" can be justified by "the context that renders [the defendant's] crimes particularly worthy of opprobrium.").[2]

Nicholson next contends that, since 2010, "terms of imprisonment in this Circuit" for "serious non-violent crimes appear to be trending downwards." (Def. Mot. at 25–26.) Given these trends, he suggests that his forty-year sentence is an outlier. But once again, he fails to show that the data and cases he cites are meaningful comparators. For example, Nicholson asserts that "the average length of imprisonment imposed for the six defendants similarly situated to [him] sentenced . . . between 2017 and 2022 was 200 months, and the median length of imprisonment imposed was 168 months" – well below the 480-month sentence that he received in 2010. (Def. Mot. at 4–5 (citing Judiciary Sentencing Information ("JSIN") data).) But he does not explain why those six defendants are similarly situated to him. The more recent cases he cites share this same problem. In *United States v. Shereshevsky*, for example, the court imposed a 262-month sentence, which was at the high end of a Guidelines range calculated using a stipulated loss of *only* $9.2 million and fewer than one-hundred victims. (*See United States v. Shereshevsky*, No. 08-cr-01092 (DC), Doc. No. 140-1 at 50 (S.D.N.Y. Aug. 19, 2011).) Similarly, the defendant who received a 140-month sentence in *United States v. Genovese*, No. 18-cr-183 (WHP) (S.D.N.Y. Feb. 12, 2020), was involved in a securities fraud scheme that resulted in just an $11 million loss. And while Nicholson makes much of the sentence imposed on Samuel Bankman-Fried – which included a

[2] Nicholson also argues that the fact that some of these defendants were granted compassionate release weighs in favor of his own motion. (Def. Mot. at 27.) But when the courts granted compassionate release in these other cases, the defendants faced very different circumstances from Nicholson's. For instance, Bernard Ebbers and John Rigas prevailed on their compassionate release motions only because they were terminally ill. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 433 (S.D.N.Y. Jan. 8, 2020); *United States v. Rigas*, No. 2-cr-01235 (KMW), Doc. No. 479 (S.D.N.Y. Feb. 19, 2016).

twenty-five-year prison term for fraud involving over $8 billion to corporate, rather than individual, investors – Nicholson fails to explain why his own case is at all analogous.[3]

Finally, it bears repeating that Nicholson's sentence is *not* an outlier among district courts across the country, and the Second Circuit has "repeatedly made clear" that courts need only consider "*nationwide* sentence disparities," rather than those within a district. *United States v. Bryant*, 976 F.3d 165, 180 (2d Cir. 2020) (quoting *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013)). Put simply, the length of Nicholson's sentence does not constitute an extraordinary and compelling reason for his release.[4]

5. Rehabilitation

Nicholson next contends that he should be released because he is "full[y] and completel[y]" rehabilitated. (Def. Mot. at 9.) But since "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason," 28 U.S.C. § 994(t) – and the Court has concluded that the other reasons advanced by Nicholson are neither extraordinary nor compelling – Nicholson's purported rehabilitation cannot salvage his compassionate release motion. But even if the Court could consider a defendant's rehabilitation in isolation when assessing a motion for compassionate release, Nicholson has not made a compelling showing of rehabilitation here.

To be sure, the Court commends Nicholson for maintaining a clean disciplinary record and actively engaging in productive programming and charitable acts toward his fellow prisoners while

[3] Notably, in arguing at sentencing for a term of imprisonment below Probation's recommendation of a 105-year term and the government's request of a forty-to-fifty-year term, Bankman-Fried's counsel sought to distinguish his conduct from that of Nicholson's: "The government points in their brief to some truly vile defendants. They point to James Nicholson, who looked widows in the eye and stole their life savings at the same time. . . . These defendants are what I would consider stone cold financial assassins. They targeted innocent people, they trained their sights on vulnerable victims. That level of depravity and cruelty and blameworthiness is nowhere [near] [w]hat I saw . . . in this case." (*United States v. Bankman-Fried*, No. 22-cr-00673 (LAK), Doc. No. 426 at 20:23–21:14 (S.D.N.Y. Apr. 9, 2024)).

[4] In a letter to the Court, Nicholson additionally argues that this Court should consider the fact that several similarly situated fraud defendants have been granted pardons or commutations of their sentences. (Doc. No. 134 at 1.) But the fact that other individuals have been pardoned has no bearing on whether Nicholson should be granted relief pursuant to section 3282; indeed, clemency is not "traditionally [the] . . . business of courts." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284 (1998) (internal quotation marks omitted).

incarcerated. On the other hand, the Court is skeptical of Nicholson's claim that he is fully rehabilitated given his continued refusal to take responsibility for his crimes and his ongoing attempts to minimize their significance. *See United States v. Gonzalez*, No. 97-cr-204 (JCH), 2021 WL 1990041, at *5 (D. Conn. Apr. 23, 2021) ("In the court's view, accountability lies at the heart of rehabilitation."). In his 2020 petition for compassionate release, for example, Nicholson characterized the whole of his multi-year criminal scheme as a one-off failure to disclose investment losses in 2008, which he described as a "poor choice." (Gov't Opp'n, Ex. A at 10; *see id.* at 3-4.) He used virtually identical language in a submission to the Court in June 2023, in which he minimized his crime to a mere "fail[ure]" to fess up to losses or abide by his "values." (Doc. No. 114-4 at 1.) And in a letter addressed to the Court in 2025, Nicholson's own son described his father's crime as a "failure of character" that occurred when Nicholson "didn't disclose . . . losses" in 2008 – which suggests that Nicholson continues to manipulate others to advance his misleading narrative. ("15 June 2025 Letter of Connor Nicholson").

As noted at sentencing and above, the record squarely contradicts this narrative. Indeed, Nicholson's attempt to frame his conduct as a singular "ethical failure" in 2008 flies in the face of the evidence establishing that he had been lying to investors for years. (PSR ¶ 73 n.2; *see also* Doc. No. 72 at 10–11) (government's sentencing submission comparing Westgate's fraudulent representations of yearly earnings, beginning in 2000, with actual yearly losses).) Nicholson's narrative also understates both the duration and scope of his scheme, which involved repeated misrepresentations that investors' funds were in secure, low-risk investments when Westgate was, in fact, repeatedly generating losses and Nicholson was diverting more than $36 million to himself. (*See* PSR ¶¶ 9–24.) In short, despite Nicholson's clean disciplinary record and his admirable acts of generosity towards his fellow inmates while in prison, his failure to acknowledge the true nature of his criminal conduct suggests that his rehabilitation is far from complete. *See United States v.*

*Nunez*, No. 10-cr-392 (CS), 2023 WL 1470502, at *1 n.1 (S.D.N.Y. Feb. 2, 2023) (denying early release because, among other things, the Court "doubt[ed] that [the defendant] ha[d] genuinely come to terms with his conduct and fully accepted responsibility"); *see also United States v. Liounis*, 592 F. Supp. 3d 43, 47 (E.D.N.Y. 2022) ("[Defendant's] claims of rehabilitation . . . ring hollow given his continued denial of responsibility"), *aff'd sub nom. United States v. Rapoport*, No. 22-716, 2023 WL 3477166 (2d Cir. May 16, 2023).

* * *

In sum, Nicholson has failed to establish that any extraordinary and compelling reason warrants his release, as required by section 3582(c)(1)(A).[5]

**B. Nicholson Cannot Establish that the Section 3553(a) Factors Warrant His Release.**

Even if Nicholson could meet his threshold burden of demonstrating an "extraordinary and compelling" reason, the section 3553(a) factors do not justify a sentence reduction at this time. *United States v. Rodriguez*, 147 F.4th 217, 220 (2d Cir. 2025) ("Even if [the defendant] had shown any extraordinary and compelling reasons to justify his release . . . we would still conclude that the district court acted well within its broad discretion in denying compassionate release on the independent basis that the [section] 3553(a) factors foreclose a sentence reduction."). "A court deciding a compassion release motion . . . must consider the factors set forth in [section] 3553(a)" in addition to any extraordinary and compelling reasons. *United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021). Those factors include (i) "the nature and circumstances of the offense and the

[5] In addition to his arguments on the merits, Nicholson also attempts to include as a "supplement" to this motion "the entirety" of the jurisdictional "arguments made by the defendant-appellant in *United States v. Ronnie Gonzalez* . . . in his brief on appeal." (Doc. No. 117.) Because Nicholson neither further explained these arguments nor cited any authority in support of them, this perfunctory, "incorporated-by-reference" approach is plainly insufficient to raise these arguments, which the Court deems forfeited. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered [forfeited]."). In any event, these arguments – that my designation to the district court violates 28 U.S.C § 291(b) and the Appointments Clause of the Constitution – have been rejected by the Second Circuit. *See United States v. Bradley*, 124 F.4th 106, 110–12 (2d Cir. 2024) (citing Lamar *v. United States*, 241 U.S. 103, 118 (1916) (dismissing the contention that the designation of a federal judge pursuant to statute usurps the Appointments Clause as "absolute[ly] unsound[]")).

history and characteristics of the defendant"; (ii) "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (iii) the Sentencing Guidelines and pertinent policy statements issued by the Sentencing Commission; and (iv) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

As the Court explained in detail at sentencing and in denying Nicholson's section 2255 motion:

> [Nicholson's] forty-year sentence was . . . [the result of] a careful assessment and balancing of the various factors identified by Congress and the Supreme Court as relevant to the calculation of a criminal sentence. . . . [T]he Court's sentencing decision was driven largely by the history and characteristics of [Nicholson], as well as the facts and circumstances of his criminal conduct, the need for general and specific deterrence, and the necessity of a just punishment that reflected the seriousness of the conduct at issue.

*Nicholson*, 2014 WL 4693615, at *10; *see id.* at *10–13. (*See also* Sent. Tr. at 69:8–23 ("I've told you before the factors that a court is required to consider in imposing a sentence. . . . Some of those factors might argue in favor of leniency; others in favor of a much more draconian sentence.").) In Nicholson's case, the reasons for imposing a forty-year sentence of imprisonment remain as salient today as they were in 2010.

First, with respect to the nature and circumstances of the offense, the Court emphasized at sentencing that Nicholson's fraud was exceptional not just for its staggering loss amount and number of victims, but also for its insidiously personal nature. (*See* Sent. Tr. at 76:17–18). As noted above, many of Nicholson's over 250 victims were individual investors – including young widows, elderly retirees, parents saving for their children's education or retirement, and his own

relatives and friends – who trusted him to safeguard their savings accumulated over decades of hard work. (*See* Sent. Tr. at 71:6–13.) Nicholson repeatedly lied to these victims about their investments, all while taking millions to fund a lifestyle that included luxury apartments and vacation homes, country-club memberships, expensive cars, and an interest in a Gulfstream 200 aircraft. (PSR at ¶ 14.) As numerous victims recounted at sentencing, Nicholson also solicited additional investments from them up until the date of his arrest, swearing on the lives of his *own* children that their funds were secure. (*See* Doc. No. 36, Ex. 32; Doc. No. 36, Ex. 37; Doc. No. 38, Ex. 51.).

The Court has previously highlighted the harm suffered by many of Nicholson's victims. (*See* Sent. Tr. at 72:15–75:17; *Nicholson*, 2014 WL 4693615, at *10–12.) It need not repeat these stories here. Instead, the Court briefly recounts some details of what his victims have continued to experience in the nearly seventeen years since Nicholson's actions:

- Gary Menze writes that Nicholson stole his life savings and his mother's retirement fund, "leaving her only with a small social security income." (Doc. No. 127-1 at 5.) As a result, "she had to go on food stamps" and later "pass[ed] away penniless after working as a nurse her entire career." (*Id.*)

- Shanna McKee lost "nearly all [of her] net worth," a sum of roughly $150,000. (Doc. No. 127-1 at 22.) In the years since, she has "worked, scrimped, and saved to partially rebuild [her] savings," but now continues to work in her 60s "with no retirement horizon in sight." (*Id.*)

- Linda Klinefelter Nelson (Mast) lost over $500,000 that she invested with Nicholson, savings built up by her family over several generations that she planned to use for her sons' college educations and her retirement. (*See* Doc. No. 127-1 at 46.) While her sons have now graduated college, she cannot retire, is "left with thousands and thousands of dollars in debt," and continues to suffer from depression and marital stress as a result of Nicholson's actions. (*Id.*)

These examples highlight just some of the financial and emotional harms that Nicholson's victims face – the retirements deferred, dramatically altered, or altogether forgone; education funds

depleted; financial safety-nets destroyed; and the attendant devastation, stress, and heartache. The upheavals suffered by his victims are no less significant today than they were seventeen years ago.

Nor do Nicholson's history or characteristics weigh in favor of his relief. While Nicholson points to his family background and upbringing as evidence of his commitment to restitution and his capacity for being a productive member of society, the Court observed at sentencing that this very background also constituted an aggravating circumstance: Nicholson "had all the advantages of life" – he was "born into a good family" and "had a good education, . . . intelligence, opportunity, good looks, charm, [and] charisma" – yet he "used many of th[ose] qualities to victimize people whose only error in judgment was trusting" him. (*See* Sent. Tr. at 70:16–24.) And while Nicholson asserts that there is "zero chance of [him] re-offending" and "[n]othing about this case or [his] history suggests that he would be a danger to the community" (Def. Mot. at 32–33), he altogether omits that he had been barred by the NASD from working in the securities industry for misconduct concerning customers' funds *before* the offense conduct at issue in this case. (*See* PSR ¶¶ 94–97, 139 & nn.5–7.) In fact, because of that NASD ban, Nicholson "was not permitted to hold himself out as an investment adviser or accept client funds for any purpose – and therefore should not have been in a position" to defraud his victims in the first place. *Nicholson*, 2014 WL 4693615, at *10. And yet he did so to the tune of over $100 million.[6]

In sum, the Court concludes that granting Nicholson's motion for compassionate release now – when he has served less than half of his sentence – would be inconsistent with the section 3553(a) factors, including the need for a sentence to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment" and "afford adequate deterrence." *Id.* § 3553(a)(2)(A), (B); *see, e.g.*, *United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020)

[6] The Court already discussed Nicholson's efforts at rehabilitation and the need to avoid unwarranted sentencing disparities for similarly situated defendants above, so it incorporates those discussions here. *See* 18 U.S.C. § 3553(a)(1), (6).

(holding that a reduction in defendant's "sentence – when he has served less than half of it – would undermine the goals of sentencing"); *United States v. Goode*, No. 16-cr-529 (NSR), 2021 WL 3500012, at *3 (S.D.N.Y. Aug. 7, 2021) ("Multiple courts have denied compassionate release motions where defendants had yet to serve the bulk of the[ir] sentences.").

## III. CONCLUSION

For the reasons set forth above, Nicholson's motion is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at Docs. No. 111, 114, and 129, and mail a copy of this Memorandum and Order to Nicholson.

SO ORDERED.

Dated: September 1, 2026
New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation